[Civ. No. 43600. Second Dist., Div. Five. Jan. 8, 1975.]

ANGELO MUSTACHIO, Plaintiff and Appellant, v.
OHIO FARMERS INSURANCE COMPANY et al., Defendants and
Respondents.

---

**Counsel**

David Laufer for Plaintiff and Appellant.

Morgan & Roper and Kermit J. Morgan for Defendants and Respondents.

---

**Opinion**

**KAUS, P. J.**—Plaintiff, Angelo Mustachio, appeals from a $3,100 judgment in his favor. Defendants and respondents are Ohio Farmers Insurance Company (Ohio) and Herbert I. Sutherland, its claims supervisor.

Plaintiff's complaints relate only to an instruction on the issue of damages and a ruling precluding him from introducing evidence on the issue of attorney's fees. The facts are stated accordingly.

FACTS

Plaintiff's rental property was insured by defendant insurance company. On April 28, 1969, the property was destroyed by fire. Arson was involved, possibly committed by a former tenant.

Defendants first suspected that plaintiff himself might be responsible for the fire. Sutherland asked one Antone P. Jasich, a private arson investigator who was formerly the head of the arson squad, to investigate and report. Jasich went to see plaintiff at his place of business, a barber shop. Within a few days Jasich reported to Sutherland that there was no indication that plaintiff was involved in setting the fire. **(1) (See fn. 1.)** Defendants then engaged one DeLeo to prepare an estimate and bid on the cost of repairing plaintiff's property.[1] DeLeo's estimate, dated May 26, was $14,164. After certain adjustments, the cash payment would have come to about $12,131.

Plaintiff was dissatisfied with DeLeo's estimate. He telephoned Sutherland who told him that if plaintiff did not accept Ohio's offer, he was going to retire the claim.[2] When plaintiff protested, Sutherland said: "By the way, Mr. Mustachio, where were you at the time of the fire?" Plaintiff replied that he had already told Sutherland that he was sleeping at the time. Sutherland replied: "Well, that's a likely story." Plaintiff felt that Sutherland was still insinuating that plaintiff was criminally responsible for the fire. This made him nervous and he placed the entire

---

[1]DeLeo was a defendant below. At the conclusion of plaintiff's case he successfully moved for a nonsuit. Although plaintiff purports to appeal "from the order of non-suit granted in favor of defendant V. T. DeLeo" no judgment of dismissal as to DeLeo was ever entered. (Code Civ. Proc., § 581d; *Bauer* v. *Jackson,* 15 Cal.App.3d 358, 363, fn. 1 [93 Cal.Rptr. 43].) The purported appeal will therefore have to be dismissed. Further, we are advised that DeLeo died in May 1974. No substitution of parties has been effected. (Cal. Rules of Court, rule 48.) Under these circumstances, it would be inappropriate for us to follow the remedial procedure discussed in *Palazzi* v. *Air Cargo Terminals, Inc.,* 244 Cal.App.2d 190, 192-193 [52 Cal.Rptr. 817].

[2]The threat to retire the file, first made on the telephone, was repeated in writing:

"This is to advise that unless this form, properly executed, is received by us within ten days from the date of this letter, we shall assume that you do not wish to pursue the matter to conclusion and shall, accordingly, retire our file without payment."

Sutherland testified that the threat to retire the file was a procedure used by some of his adjusters "to get [the insureds] back in touch with [the company]." He denied insinuating that plaintiff had committed arson.

problem in the hands of an attorney. The attorney conducted all subsequent negotiations with defendants.

After a joint appraisal, the insurance claim was settled in December 1969. Ohio paid plaintiff a total of $14,596, $12,806 as the cash value, plus $900 for debris removal, $800 for loss of rent and $90 for loss of shrubs.

In May 1970, plaintiff filed a complaint, later amended, alleging a breach of defendants' covenant of good faith and fair dealing, plus intentional infliction of emotional distress.[3] Plaintiff asked for special damages according to proof, $50,000 in general damages and $150,000 in exemplary damages.

As noted, the jury returned a verdict in plaintiff's favor in the amount of $3,100 general damages. It awarded no exemplary damages.

## DISCUSSION

Although defendants have not appealed, they may urge error of which they were the victims "for the purpose of determining whether or not the appellant was prejudiced . . . ." (Code Civ. Proc., § 906.) This they do by arguing that the case never should have been submitted to the jury since neither of them was guilty of any actionable wrong.

We disagree. There was substantial evidence—albeit contradicted—to support a verdict in favor of plaintiff. An insurance company which has no defense to a claim as such, has no business threatening to retire its file if the claimant does not accept its first offer. Further, it violates every principle of good faith and fair dealing to intimate to the assured that he is suspected of arson when any basis for such a charge has been eliminated by the only investigator employed to look into it. The case properly went to the jury.

We must therefore consider plaintiff's claims of error. The first of these relates to the question whether he could prove, as part of his damages, the reasonable value of attorney's fees incurred in connection with the negotiations leading up to the settlement of his policy claim against Ohio.[4] The question came up during plaintiff's own testimony

---

[3] The complaint calls itself as being for "emotional distress," but the label is too restrictive. It closely resembles the pleading discussed in *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566, 580 [108 Cal.Rptr. 480, 510 P.2d 1032].

[4] There is no contention that defendants are liable for attorney's fees incurred in this action.

when he was asked whether he had obligated himself for such fees. The defense successfully objected to any evidence on the issue.[5]

Undoubtedly, the general rule is that absent contractual or statutory authorization, attorney's fees are not recoverable either as damages or costs, even in litigated disputes between insurer and insured. (*Carroll* v. *Hanover Insurance Co.,* 266 Cal.App.2d 47, 51 [71 Cal.Rptr. 868]; *Financial Indemnity Co.* v. *Murphy,* 223 Cal.App.2d 621, 632-633 [35 Cal.Rptr. 913].)

Nevertheless, defendants' reliance on the general rule misinterprets the nature of this action. "[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 575.) Moreover, "such conduct on the part of a[n] . . . insurer constitutes a tortious interference with a protected property interest of its insured for which damages may be recovered to compensate *for all detriment proximately resulting therefrom,* including economic loss as well as emotional distress resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages." (*Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376, 401-402 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], discussed with approval in *Gruenberg, supra,* 9 Cal.3d at pp. 574-575; italics added.)

It follows as a matter of course that if the insurer's tortious conduct makes it reasonable for the insured to seek the protection of counsel, the insurer is responsible for that item of damages. This is the necessary result not only of *Fletcher,* but also of *Crisci* v. *Security Ins. Co.,* 66 Cal.2d 425, 434 [58 Cal.Rptr. 13, 426 P.2d 173], where the Supreme Court pointed out that among "the considerations in purchasing . . . insurance, as insurers are well aware, is the peace of mind and security it will provide in the event of an accidental loss . . . ." A policy affords very little peace of mind when, as here, the company attempts to coerce the insured into accepting its first offer by stating, orally and in writing, that if he did not do so it would retire the claim—thereby forcing him to retain counsel to recover even the admitted amount—and without any basis in fact whatever implies that the insured has committed arson. Such conduct is clearly beyond the pale of the insurer's undoubted privilege to assert its legal rights "in a permissible way and with a good

---

[5]In plaintiff's brief in this court he claims that the amount involved is $650. Unable to find any reference to such a figure in the record, we asked for enlightenment at the oral argument. Counsel informed us that the figure was mentioned during an unreported offer of proof at the bench. He conceded that at the retrial $650 would be a ceiling on his client's claim for attorney's fees.

faith belief in the existence of the right asserted." (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376, 395.)

If the insurer, instead of bargaining with the insured in good faith, tortiously violates its covenant of good faith and fair dealing and thereby makes it reasonable for the insured to seek the protection of counsel, plain justice demands that the insurer be financially responsible for an expense which but for its tortious conduct would not have been incurred.[6] Further, we must assume that when the court in *Fletcher, supra,* spoke of "all detriment" it meant what it said.[7]

We have no way of determining by how much, if at all, the jury would have increased its award had plaintiff been permitted to offer evidence of attorney's fees. The error in rejecting it out of hand was therefore necessarily prejudicial.

[6]In spite of the court's ruling excluding evidence of attorney's fees, defendants attempted to show that it was not their conduct which drove plaintiff into the arms of counsel. We quote from their cross-examination of plaintiff on that point.

"Q. At the time that you went in to see [counsel] was there anything wrong with your emotional balance?

"A. When I went to see [counsel]?

"Q. Yes, sir.

"A. Yeah, I was a little shaky and nervous about the whole situation.

"Q. What were you nervous about?

"A. Mr. Sutherland asking me where I was at the time of the fire, and 'That's a likely story.'

"Q. So those words had caused you to be nervous and shaky clear up to the time you went in to see [counsel]?

"A. That's right, and past that, too.

"Q. Then you went in to see [counsel]. Had you lost any work up to the time you went in to see him?

"A. Oh, yes.

"Q. You went in to see [counsel], and then you turned everything over to him, and you said, 'Would you please handle this with Mr. Sutherland?' Right?

"A. Right.

"Q. Mr. Mustachio, did you really believe that Mr. Sutherland would close out his file and not pay you a dime?

"A. Yes, I did."

[7]Naturally there will be situations where the insured seeks the aid of counsel not only because the insurer's tortious conduct has made it reasonable that he do so, but also because the underlying legal or factual complexities of the dispute between the parties are such that he needs expert, professional assistance. We do not suggest that the insurer would be liable for that portion of the attorney's fees which the insured would have had to incur even if there were no question of bad faith. We assume, however, that the burden of proving the proper apportionment would rest with the insurer as "the party whose . . . conduct created the problem. To place the burden on the injured party rather than upon the wrongdoer would, in effect, clothe the transgressor with immunity. . . ." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608].)

■ Plaintiff's second assignment of error is based on a proposition which is legally correct but factually inapplicable to this case. It derives from the trial court's refusal to instruct that defendants were liable for economic loss caused by their conduct even if such loss was not the result of emotional distress tortiously induced by them. In other words, under the court's instructions, if the jury discounted plaintiff's complaints of emotional distress, he could not recover for economic loss either.

No good purpose would be served by explaining again that it necessarily follows from the *Fletcher* and *Gruenberg* decisions, that an insurer who tortiously violates its covenant of good faith and fair dealing is responsible for all damages proximately caused by its conduct. *Fletcher* speaks of "economic loss *as well as* emotional distress," not only economic loss caused by emotional distress. (10 Cal.App.3d at p. 402. Italics added.)

As indicated, plaintiff's difficulties on this point are not legal, but factual. In support of his claim of error, he supplies us with a shopping list of economic losses he suffered—or may have been found to have suffered—directly, rather than as a consequence of emotional distress: his loss in market value of the burned property, an increase in the loan interest rate, appraisal fees, demolition costs, a demolition permit, and loss of rental.[8] The items listed either have nothing to do with defendants' tortious conduct or were included in the settlement of plaintiff's policy claim. Plaintiff admitted as much during a chamber discussion concerning the instruction on damages:

"THE COURT: All right, tell me an example, a dollar example of—to compensate for detriment caused from economic loss.

"[Counsel for plaintiff]: All right, the economic loss here is the inability to have the property *as it was before the bad faith.*" (Italics added.)

Plaintiff still ignores that what destroyed his property was fire, not bad faith. His settlement of the insurance claim covered all of his losses

---

[8]Thus, plaintiff testified that the savings and loan association "had to write me up a new loan [on the property]. They wouldn't accept the old loan because the collateral was gone." He testified that he paid $100 for the appraisal of his house, $1,150 to have the premises demolished, $11.55 for a permit to demolish the house,—demolition had been recommended by the City—and that after the fire, the value of his property dropped from $60,000 to $40,000.

caused by the occurrence for which Ohio was obligated to compensate him under the terms of its policy.

## DISPOSITION

The only error was the trial court's exclusion of evidence on attorney's fees. As noted (*supra,* fn. 5) it is conceded that the maximum possible recovery therefor is $650. Accordingly, we make the following disposition: The judgment against Ohio and Sutherland is reversed for a new trial limited to the issue of attorney's fees, unless defendants Ohio Farmers Insurance Company and Herbert Sutherland agree in writing within 10 days of our remittitur that the judgment be modified to reflect an additional $650 award. In the latter event, there shall be no retrial.

The purported appeal from the ruling in favor of defendant DeLeo is dismissed.

Plaintiff and defendants shall each be responsible for half the total costs on this appeal.

Ashby, J., and Hastings, J., concurred.